## STATE v. CHARLES CRAWFORD.[1]

### July 14, 1905.

#### Nos. 14,414—(26).

**Swindling.**

> Evidence examined, and *held* sufficient to sustain the conviction of defendant of the crime of swindling.

**Failure of Defendant to Testify.**

> Certain remarks by the county attorney in his address to the jury *held* not a violation of the statute forbidding reference to the failure of defend- ant in a criminal prosecution to be sworn as a witness in his own behalf.

Appeal by defendant from an order of the district court for Ramsey county, Brill, J., denying a motion for a new trial, after a trial and conviction of the crime of swindling. Affirmed.

*Halbert & Halbert,* for appellant.

*T. R. Kane* and *O. H. O'Neill,* for the State.

BROWN, J.

Defendant was convicted of the crime of swindling, and appealed from an order denying his motion for a new trial. Three questions are presented to this court: (1) Whether the county attorney was guilty of misconduct in his remarks to the jury; (2) whether the court erred in admitting and excluding certain evidence on the trial; and (3) whether the evidence is sufficient to support the verdict.

Taking up the last question first, a brief statement of the facts will be made. The evidence shows, or tends to show, that the complaining witness, McLeod, a young man about twenty-one years of age, came from his home in Virginia, ten miles from Washington, D. C., to St. Paul, in August of last year, in search of employment. He had remained several weeks in St. Paul, and on the day charged in the indictment met one Morgan on the streets. The latter represented that he was a stranger in the city from Texas on his way to Montana. Complainant entered into a conversation with him, made inquiries concerning business opportunities in Montana, and disclosed the fact that he

[1] Reported in 104 N. W. 295.

had $600 or $700 to invest in some enterprise. The parties separated until the next day, when Morgan called upon complainant at his boarding house, and after some informal talk stated to him that he intended sending his family to Washington to spend the summer, and sought information concerning places of interest around and about that city. Complainant gave him all the information on the subject he possessed, and after some more talk Morgan invited him to take a walk about the city. He accepted, and during their walk Morgan complained of the annoyance he had been caused by a persistent newsboy on the train who played tricks upon the passengers with marked cards. He fully explained the trick to complainant, and disclosed to him that by a given mark a particular card could be invariably selected from several others. The young man became interested in the matter, was completely thrown off his guard by the manner and apparent candor of Morgan, and placed entire confidence in his new-found friend. They soon reached the grounds of the new capitol, when defendant appeared on the scene, and was questioned by Morgan and complainant as to the material used in the new capitol building. He stated that he was from Utah, and knew nothing about it. Further conversation resulted in Morgan's disclosing the trick with the cards to defendant, saying that his friend, complainant, could draw the right card every time. Defendant doubted his ability to do so, and offered to bet two dollars on the result. The card had been previously marked by Morgan in the presence of complainant. He drew the right one and defendant lost his two dollars. Morgan took the money and handed one dollar to complainant, retaining one dollar as his own. Defendant became to all appearances greatly interested in the trick, and offered to bet $1,000 that complainant could not again draw the right card, whereupon Morgan stated that he did not have $1,000 with him, but had a draft for $12,000 which he would put up. Defendant declined to have anything to do with bank paper, stating that if he was going to bet his money he wanted good money put up against it, whereupon Morgan called complainant aside, and asked if he had his money with him, saying that he did not propose to have that stranger come along and put up a big bluff like that; that he knew they could turn the trick on him and get his money. Complainant did not have the money with him. He had previously deposited it in one of the St. Paul banks.

The parties then started for the bank for the purpose of drawing it out and making the wager with defendant. But on arriving at the bank, they found it closed, and the parties all separated.

They met again the next morning, when Morgan and complainant, after some consultation, went to the bank, and complainant drew out $500 in five $100 bills. They then found defendant, and the three went to the Indian Mounds Park, where defendant produced $1,000, complainant the $500, and the wager was made that complainant could not draw the winning card. Complainant drew a card, but it was the wrong one; and Morgan, who held the money, handed it over to defendant. Some talk was then indulged in by Morgan to the effect that defendant ought to give them a chance to win their money back, which finally resulted in a statement by defendant that he understood their game; that they were swindlers, had taken him for a "sucker," and that he intended to notify the police, and have them taken into custody. Morgan then suggested to complainant that they were liable to get into trouble, and had better leave the city as soon as possible. They returned to the city without further effort to regain the money, and separated. After reaching the hotel, complainant began to reflect on the events of the two days and the conduct of his new-found friend, and concluded that he had been robbed and swindled. He reported the matter to the police department, and defendant was subsequently charged with the offense, being positively indentified by complainant as one of the parties engaged in the swindling operation. When arrested, defendant sought to make a settlement of the matter by returning the money to complainant, which was refused; but he protested at all times that he was innocent, and that it was a case of mistaken identity. The jury, on this evidence, which appears in the record in greater detail, found defendant guilty, and the verdict has been approved by the trial court.

1. It is urged in support of the contention that the evidence is insufficient to sustain the verdict; that it conclusively shows that complainant entered into a conspiracy with Morgan to defraud defendant, and voluntarily parted with his money for an unlawful purpose; that, therefore, no charge of swindling can be lodged against defendant, even though it be conceded that he received the money at the time and under the circumstances disclosed by the evidence. There is no merit

to this contention. It is very probable that Morgan, by his manner and methods, led complainant to believe that he could easily double his money, and complainant may have had visions of suddenly acquired riches, but the fact remains that he was the victim; Morgan and defendant were the conspirators. To constitute a conspiracy, the minds of the two or more parties must meet on a definite line of action and a particular result. Between Morgan and complainant there was no definite plan of action with a specific purpose in view. Morgan was misleading complainant, and had the separation of complainant and his money in view at all times, with no intention whatever of disturbing that possessed by defendant. It was but a repetition of an old plan of swindling. A case of similar nature was before us not long ago. State v. Evans, 88 Minn. 262, 92 N. W. 976. Our examination of the evidence leads to the conclusion that the verdict of guilty was the only result the jury could reach consistent with the evidence before them.

2. In his argument before the jury the county attorney made use of the following language:

> In this case, from start to finish, the jury in their deliberations are relieved from the anxiety and from the difficulty that often confronts a jury where there is conflicting and contradictory testimony. In this case there is no conflict, there is no contradiction, and there is no denial.

Mr. Donnelly: "If the court please, one moment, I would just like an exception to the remarks made by counsel that there is no denial." The county attorney, continuing, said:

> The grand jury of Ramsey county has indicted the defendant here, with another, as being the parties who committed that wrong, and the defendant upon an arraignment upon that indictment denied that he committed it, and that forms the issue in this case. Did the defendant in this trial—did the defendant at the time and place stated in the indictment—aid, abet, assist, or take part in the transaction by which Joseph Manning McLeod and his money were separated?

It is contended in support of the proposition that the county attorney was guilty of misconduct in the use of this language, that he violated

the statute which prohibits a reference on the trial of a criminal prosecution to the failure of the defendant to be sworn as a witness in his own behalf. We do no concur in this contention. The statement of the county attorney that the jury would have no difficulty in determining the merits of the case because there was no contradictory testimony, and no denial of that given by the state, was no doubt an inadvertence, and not intended as an allusion to the fact that defendant was not sworn as a witness. It is clear from the whole record that defendant was in no way prejudiced thereby. The county attorney, upon exception being taken, followed up the matter, and in a measure relieved the remark of any injurious effects by stating that defendant, by his plea of not guilty, denied the charge made against him. Some authorities cited by counsel for defendant seem to sustain the position taken by them to the effect that the remarks were prejudicial and reversible error. But we are not inclined to follow them. They are founded upon too strict an application of the rules of criminal practice and procedure, wholly unnecessary for the protection of the legal rights of an accused person or to a substantial administration of our criminal law. The remark of the county attorney did not impress the learned trial court as of any special significance, and the fact that it denied defendant's motion for a new trial discloses that in its judgment no prejudice resulted therefrom.

3. We have examined the assignments of error on the subject of the admission and exclusion of evidence, with the result that no reversible error is disclosed.

Order affirmed.